IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MOSES L. SMITH, : | |
| a/k/a TYRE SMITH : | CIVIL ACTION |
| : | |
| v. : | |
| : | |
| TODD BUSKIRK : | NO.  12-4259 |

## MEMORANDUM

ELIZABETH T. HEY, U.S.M.J.                                                        January 21, 2015

In this action, Plaintiff Moses L. Smith a/k/a Tyre Smith ("Plaintiff"), a former inmate at Northampton County Prison ("NCP") in Easton, Pennsylvania, seeks damages from Todd Buskirk ("Defendant"), Warden of NCP, for health issues allegedly attributable to NCP's water supply.  Presently before the court is Defendant's motion for summary judgment and supportive filings (Docs. 87, 88 & 90) and Plaintiff's response in opposition (Doc. 92).  For the reasons that follow, the motion for summary judgment will be granted.

I.  **FACTUAL AND PROCEDURAL BACKGROUND**[1]

Plaintiff was an inmate at NCP from November 9, 2010, until March 23, 2013. See Doc. 7 ("Complaint") at 2; Pl. Dep. at 14-15.[2]  In his Complaint, Plaintiff avers that he has been "poisoned" by "toxic waters" which he had to use for showering, brushing his teeth, drinking, and in food preparation, and that the toxicity is demonstrated by discolored water from "corroding pipes that may be connected to lead pipes."  Complaint at 3.  Plaintiff's Complaint also states that he was harmed by exposure to asbestos located around pipes and overhead in NCP's gymnasium area.  Id.  Plaintiff subsequently abandoned any claim related to NCP's air quality, leaving only a claim for damages related to NCP's water supply.  See Doc. 76 n.1; Pl. Dep. at 10.[3]

---

[1] The fact record is extremely sparse because the parties have not engaged in a great deal of discovery.  Along with his motion and memorandum of law, Defendant submits Plaintiff's deposition conducted on October 7, 2014, which was the only deposition taken in the case (Doc. 88, hereinafter "Pl. Dep."), and an affidavit submitted by Defendant (Doc. 90, hereinafter "Buskirk Aff.").  Plaintiff has not obtained medical or water expert reports and did not supplement his response with any exhibits related to his claims or damages.  Other than Plaintiff's deposition, all documents are cited according to the court's ECF pagination.

[2] The precise date of Plaintiff's last day at NCP is not explicitly stated in the records provided by the parties, and Plaintiff's testimony in this regard is equally unclear. See Pl. Dep. at 14-16.  However, according to a previous filing, Plaintiff was transported from NCP to the hospital for severe abdominal pain and hospitalized for five days beginning on March 23, 2013.  See Doc. 47.  At his deposition, Plaintiff explained that he did not return to NCP following this hospitalization, but was instead sent directly from the hospital to Graterford before being moved to Camp Hill and then to SCI-Mahoney, where he was released from custody on August 12, 2013.  See Pl. Dep. at 14-16.

[3] Plaintiff did not formally withdraw or dismiss his damages claim for alleged airborne contaminants.  However, during a teleconference held on June 19, 2014, Plaintiff represented to counsel and the court that he would not be seeking damages related to airborne contaminants, and he withdrew his request for air samples as part of

2

Taken in the light most favorable to Plaintiff, the facts are as follows. Plaintiff made numerous complaints to NCP personnel of physical issues such as diarrhea, constipation, vomiting, skin irritation, headaches, and respiratory problems, all of which recurred and resulted in emotional distress, as well as a hernia which he attributes to his gastrointestinal issues. Complaint at 3, 5; Pl. Dep. at 20-22, 38, 41-42, 47-48.[4] Plaintiff's complaints to NCP staff were ignored or "returned" and he was "black listed" for complaining too often, and therefore his later grievances were "disregarded and never reache[d] highest authority." Complaint at 4. Plaintiff told NCP's medical staff his concerns about the water, but he did not recall what they said. Pl. Dep. at 41. Plaintiff admits that he never spoke to Defendant about NCP's water supply, and that he filed suit against Defendant simply because he was the Warden of NCP. Id. at 22, 26. In addition, Plaintiff could not recall sending any grievances to the Director of Corrections, who is above Defendant in the prison hierarchy. Id. at 23.

Plaintiff had no health issues before he was housed at NCP, including no stomach complaints and no hospitalizations. Pl. Dep. at 12, 14. The water coming out of the

---

his discovery request at that time. See Doc. 76 at n.1. Plaintiff confirmed this at his deposition. See Pl. Dep. at 10. Plaintiff did not thereafter seek discovery related to airborne contaminants. Instead, Plaintiff filed a motion requesting that the court pay a specified expert to test NCP's water supply. See Doc. 80. I denied Plaintiff's request for court payment by Order dated September 4, 2014, see Doc.85, and the proposed water testing apparently did not occur.

[4]During his deposition, Plaintiff stated that an incident of severe abdominal pain, nausea, diarrhea and vomiting which occurred on March 23, 2013, was likely the result of something toxic having been put in his food, and not to NCP's water supply. Pl. Dep. at 46-47.

3

faucets at NCP was discolored, and Plaintiff verified this by having the water run through his white prison-issued clothing, which then became discolored. Id. at 30-31. Other inmates duplicated his tests using their own prison-issued clothing, but he was not aware of any other inmates getting sick from the water. Id. at 34. Plaintiff drank the NCP water for "maybe two months," the water "messed up my system" and caused the symptoms set forth in his Complaint, and the issues he had with diarrhea and constipation stopped when he stopped drinking the water. Id. at 37-41.

After his release from prison, Plaintiff went to the emergency room twice for hernia pain and blood in his urine, the latter apparently attributable to "hemorrhaging" in his one and only kidney. Pl. Dep. at 19-21.[5] The hernia developed "[s]omewhere during my visit at [NCP]," and he therefore attributes the hernia to his gastrointestinal problems at NCP. Id. at 13, 21-22. Plaintiff explained that the attending physician at the hospital advised him to seek private medical care, but he has been unable to see a doctor due to lack of insurance. Id. at 19-20. He has not pursued mental health treatment for alleged emotional distress for the same reason. Id. at 43. Plaintiff has acknowledged that no doctor ever attributed his problems to water and that he has no medical evidence that he suffered any injuries as a result of NCP's water supply. Id. at 26, 42.

Plaintiff commenced this pro se lawsuit by filing a Complaint on September 27, 2012, seeking $1 million in damages for his physical and mental suffering, testing of NCP's water, food and facility by federal authorities, and the creation of a fund to

---

[5]Plaintiff explained that he was born with only one kidney. Pl. Dep. at 12.

compensate other inmates.  See Complaint at 5-6.  Defendant filed his Answer on November 6, 2012.  See Doc. 12.  The parties thereafter consented to proceed before a magistrate judge, and the Honorable William H. Yohn, Jr., referred the case to me on December 11, 2012.  See Docs. 17, 18 & 21.  Plaintiff repeatedly requested the assistance of counsel, but the court's efforts in this regard were unfruitful and Plaintiff has at all times represented himself.[6]

Defendant filed the present motion for summary judgment on December 8, 2014, and separately filed the complete transcript of Plaintiff's deposition and a sworn affidavit from Defendant.  See Docs. 87, 88 & 90.  On December 29, 2014, Plaintiff filed a response which does not contain or attach any additional evidence.  See Doc. 92.

---

[6] In his response to the motion, Plaintiff implies that the court made insufficient efforts to acquire counsel.  See Doc. 92 at 6.  To the contrary, the court made substantial efforts to obtain counsel for Plaintiff.  By Order dated March 25, 2013, I granted Plaintiff's first motion for appointment of counsel and submitted this matter to the Prisoner Civil Rights Panel (Doc. 41), and by Order dated July 17, 2013, I stayed the case until Plaintiff obtained counsel from the Panel or for four months, whichever came first (Doc. 49).  Because no attorney agreed to represent Plaintiff within the allotted time, by Order dated December 2, 2013, I vacated the Order granting Plaintiff's first motion for appointment of counsel and lifted the stay.  See Doc. 26.  Thereafter, Plaintiff renewed his request for appointment of counsel – first by letter to the court dated November 23, 2013, and then by motion, see Docs. 57 & 62 – and also began filing a series of discovery-related motions, some without signatures.  By Order dated February 4, 2014, I granted Plaintiff's renewed request for appointment of counsel, stayed the case a second time, and again submitted it to the Civil Rights Panel.  See Doc. 67.  No attorney accepted Petitioner's case during the following three months, and therefore I lifted the second stay by Order dated May 23, 2014.  See Doc. 69.  Plaintiff was apparently unsuccessful in his own attempts to retain counsel.  See Pl. Dep. at 42-43.

## II.    SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).[7] A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute. . . ." Fed. R. Civ. P. 56(c)(1)(A), (B). "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." Boykins v. Lucent Techs., Inc., 78 F. Supp.2d 402, 408 (E.D. Pa. 2000). The evidence presented must be viewed in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255; Lang v. New York Life Ins. Co., 721 F.2d 118, 119 (3d Cir. 1983).

## III.    DISCUSSION

As previously stated, Plaintiff alleges that he was poisoned by NCP's water supply while housed at the facility from November 2010 until March 2013. "It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is

---

[7]Anderson predated the 2010 Amendment to Rule 56. However, the change in wording and location within the rule for the summary judgment standard did not alter the standard or caselaw interpretation of the standard. Fed. R. Civ. P. 56 advisory committee's note to 2010 Amendments.

6

confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31 (1993). The Constitution does not mandate comfortable prisons, but it does require prison officials to "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take 'reasonable measures to guarantee the safety of inmates.'" Farmer v. Brennan, 511 U.S. 825, 831 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)); see also DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. . . ."). It follows, therefore, that housing prisoners in unsafe conditions constitutes cruel and unusual punishment. Helling, 509 U.S. at 33 (citing Youngberg v. Romeo, 457 U.S. 307, 315-16 (1982)). A prisoner's Eighth Amendment claim can be based upon present harm or possible future harm to health caused by unsafe prison conditions. Id. at 33, 35 ("We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery."). However, while "[p]oisoning the prison water supply or deliberately inducing cancer in a prisoner would be forms of cruel and unusual punishment," a prison's failure to "provide a maximally safe environment, one completely free from pollution or safety hazards," is not. Carroll v. DeTella, 255 F.3d 470, 472-473 (7th Cir. 2001) (citations omitted).

    A plaintiff who asserts that unsafe prison conditions gave rise to an Eighth Amendment violation must satisfy two requirements – one objective and the other

substantive – and if a plaintiff fails to prove either prong of this test, a finding in favor of the defendant is warranted. Brown v. Williams, 399 F. Supp.2d 558, 565 (D. Del. 2005) (citing Helling, 509 U.S. at 35). In the context of Plaintiff's lawsuit, the objective prong requires him to demonstrate that he was personally exposed to unreasonably high levels of contaminated water. Helling, 509 U.S. at 35. This requires "more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such an injury to health will actually be caused by exposure" to the contaminants, but also the court's assessment as to whether the contamination is "so grave that it violates contemporary standards of decency to expose *anyone* unwilling to such a risk." Id. at 36 (emphasis in original). The subjective prong requires Plaintiff to demonstrate "deliberate indifference" on the part of prison officials in exposing him to contaminated water. Id. at 36-37. That is, a prison official cannot be found liable under the Eighth Amendment unless he "knows of and disregards an excessive risk to inmate health or safety; the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." Farmer, 511 U.S. at 837. Moreover, "a defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior." Brown, 399 F. Supp.2d at 563 (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)).

    Here, Plaintiff fails to satisfy both the objective and subjective requirements of an Eighth Amendment claim. As for the objective requirement, Plaintiff alleges that he suffered diarrhea, constipation, vomiting, and skin conditions as a result of ingesting

NCP's water, as well as a hernia which he attributes to constipation. However, Plaintiff does not provide any evidence that would support an inference that the water was contaminated or by what substance, or that his physical ailments were caused by such contamination. His testimony that the water was discolored is insufficient to prove that the water was unsafe. Plaintiff also fails to rebut the statements contained in Defendant's sworn affidavit,[8] wherein Defendant explains that Eastern Suburban Water Authority supplies the water for NCP and the water flowing into NCP is consumed by inmates and prison staff, including himself. Buskirk Aff. ¶¶ 2-3.[9] The latter averment is particularly important because Plaintiff stated at his deposition that other inmates did not experience problems with NCP's water:

> Q.   All right. To your knowledge, did anyone in F unit or any of your cellmates ever get sick from drinking the water?
> A:   Not to my knowledge.

Pl. Dep. at 34.

In his response to the motion, Plaintiff notes that prison officials allegedly removed "favorable evidence" from his cell on more than one occasion. See Doc. 92 at

---

[8] Federal Rule of Civil Procedure 56 states in relevant part that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Defendant's affidavit meets these requirements.

[9] Defendant also states in his motion that annual test results from NCP's water supplier showed water levels were consistent with acceptable standards and posed no health risk. See Doc. 87-2 at 10. Because this allegation is not supported by any document or testimony in the discovery record, I do not rely on it.

9

3, 4.[10] The confiscated materials are not identified by Plaintiff, but they appear to have been related to his personal efforts to test the "purity" of NCP's water.[11] Assuming such materials existed and were removed from Plaintiff's cell, they would not constitute sufficient evidence of injurious water contamination, let alone prove a causal connection between the water and Plaintiff's symptoms.

In Brown, a prisoner claimed that the prison water turned his socks brown and bluish-green, but the court granted summary judgment to defendants because the plaintiff had presented no proof that he was exposed to unreasonably high levels of contaminated water. 399 F. Supp.2d at 566.[12] The court then explained that even if the water had some level of contamination, the plaintiff had made "no showing that such exposure violated contemporary standards of decency." Id. The same is true in the present case, and therefore no genuine dispute exists as to Plaintiff's exposure to contaminated water. See id.; see also Wolfe v. Christie, No. 10-2083, 2013 WL 3223625, at * 5 (D.N.J. June 25, 2013) (granting summary judgment for defendants

---

[10]When Plaintiff raised this issue during discovery, counsel for Defendant represented to Plaintiff and the court that he had conferred with prison officials who had no knowledge of any such materials confiscated from Petitioner.
In his response, Plaintiff raises other issues related to discovery. For example, Plaintiff avers that Defendant sent discovery to the wrong address and has still not provided certain discovery, apparently including water test results. See Doc. 92 at 1-2, 8. While these averments, if true, are troubling, I note that these issues were not brought to the court's attention after the close of discovery on October 17, 2014. See Doc. 75.

[11]For example, as previously noted, Plaintiff testified at his deposition that water from NCP faucets discolored his white prison-issued clothing. Id. at 30-31.

[12]An investigation by prison maintenance revealed the discolored water was due to the water company backflushing its system. Brown, 399 F. Supp.2d at 561.

where plaintiff who asserted contaminated prison water caused an occasional rash did not provide any evidence that the water was actually contaminated); Crocamo v. Hudson County Corr. Ctr., No. 06-1441, 2007 WL 1175753, at *6 (D.N.J. April 19, 2007) (granting summary judgment for defendants where plaintiffs who asserted unsanitary drinking water caused rashes and skin infections failed to produce "any evidence upon which a reasonable jury could find a constitutional violation had occurred").

As for the subjective requirement, Plaintiff has presented no evidence from which a fact-finder could conclude that Defendant was aware of a substantial risk to inmate health or safety as a result of NCP's water supply, and then affirmatively disregarded the risk. To the contrary, as previously noted, Plaintiff stated in his deposition that he told NCP's medical staff his concerns about the water, but did not recall what they said. Pl. Dep. at 41. Plaintiff also stated that he never spoke to Defendant personally about anything, including NCP's water supply, and that he filed suit against Defendant simply because he was the Warden of NCP. Id. at 22, 26. In his affidavit, Defendant states that he was unaware of any contamination of NCP's water supply and therefore believed it was safe and appropriate for human consumption, that the prison medical staff did not alert him to any dangerous condition of the water supply, and that had he been aware of a problem with NCP's water supply, he would have alerted the appropriate department to affect repair. Buskirk Aff. ¶¶ 4, 6, 8.

Courts have granted defense summary judgment motions where evidence of subjective knowledge of a problem is far greater than presented here. For example, in Carroll, the defendant proved that there were increased levels of radium in the prison

11

water, but the court found that the prison did not have a duty to take remedial measures against pollution or other contamination because the state agency with responsibility for those hazards – in Carroll, the Environmental Protection Agency – did not believe remedial measures were warranted. 255 F.3d at 472-73. Furthermore, the court in Carroll held that the fact that the prison gave bottled water to staff free of charge did not show awareness of a substantial hazard. Id. at 473. Similarly, the court in Brown held that the plaintiff did not present any evidence from which a fact-finder could conclude that defendants were aware of any risks associated with the prison water, or that they affirmatively disregarded such risks, even though defendants knew of the inmates' concerns about the water conditions though the grievance process. 399 F. Supp.2d at 566-67. [13]

In sum, a factfinder presented with Plaintiff's testimony would be left to guess as to whether any contamination existed in NCP's water supply, and guess as to the cause or causes of his skin irritation and gastrointestinal issues. Stated differently, a factfinder in this case cannot determine whether Plaintiff suffered injuries related to NCP's water supply based on a determination of Plaintiff's credibility. Rather, assuming Plaintiff's testimony would be fully credited, it leaves all questions related to water contamination

---

[13] Here, Plaintiff avers that he was "black listed" by NCP staff for complaining too often, and therefore his grievances concerning the water were "disregarded and never reache[d] highest authority." Complaint at 4. Similarly, in response to the present motion, Plaintiff avers that he "has been the malicious target of ongoing harassment" by various state actors, Doc. 92 at 6, and that records are being withheld by Defendant which would "prove" the toxic water situation at NCP. Id. at 8. While Plaintiff's beliefs are undoubtedly sincere, without proof, they amount to bald assertions and therefore do not give rise to any genuine disputes for trial.

in the realm of pure conjecture, leaving a jury to speculate as to whether any contamination existed and whether it caused Plaintiff any injury. This the law does not allow. See, e.g., Helling, 509 U.S. at 35-37. Furthermore, Plaintiff has presented no evidence that Defendant was deliberately indifferent to water contamination at NCP. Accordingly, I conclude that Defendant Buskirk is entitled to summary judgment.

## IV. **CONCLUSION**

To prevail in an Eighth Amendment action alleging injuries from an unsafe prison condition, a plaintiff must satisfy an objective requirement (exposure to an unsafe condition, in this case alleged contaminated water) and a substantive requirement (deliberate indifference by prison officials, in this case Defendant Buskirk). Viewing the record evidence in the light most favorable to Plaintiff, the most that can be inferred is that he experienced skin irritation and gastrointestinal issues while incarcerated at NCP. However, in the absence of any evidence of the presence of dangerous contaminants in the water, the cause or causes of Plaintiff's skin irritation, gastrointestinal issues and hernia remains a matter of pure conjecture. Similarly, there is no evidence that Defendant Buskirk was made aware of any issues with NCP's water supply. Therefore, I will grant judgment for Defendant as a matter of law. An appropriate order follows.